Good morning. May it please the court. My name is Todd Lemethal and I represent Mr. Cauley. Mr. Cauley was engaged in a mortgage fraud scheme wherein his role, his very limited role, was he was a printer. And he was the person who would create fake loan documents for Mr. Urban, who was the ringleader of this. Mr. Cauley was ultimately charged in Counts 1 and 2 with mail fraud. And that's the sole question here today is whether or not the mailing from SPMC to their office from Nevada to Folsom, California, was enough and in furtherance of the mail fraud in Counts 1 and 2. Whether or not the scheme reached fruition prior to that point. And it's our position that it did. If you look at the process of a loan application and how that goes, you file a loan application, you fill it out, you send it in. The approval process then commences. And then it goes into an escrow. And if it's approved, it's funded. Once it's funded, then it's the scheme to defraud through the mail is over. The mere fact that they sent from one establishment to the other, from Nevada to Folsom, sent it to be serviced by Countrywide, has no bearing on whether the scheme or the mail. You're saying that offloading, I mean, they're certainly offloading their obligation at that point, but you're saying that's not part of the scheme. That's correct. If SPMC decided to service that loan as well, then... My understanding of the record is that they're offloading it, as Judge McKeown is suggesting, not only for servicing, but they're selling the loan. Isn't that right? They're reselling the loan, but they've already funded the loan. I understand that. But servicing the loan is different from selling the loan. That is to say, you've got servicers who take the money in and send it where we're supposed to go, and you've got the holder of the loan. And they're doing two things. They're sending it off to Countrywide, so they're selling the loan. They're not just locating the service somewhere else. That's correct. Which makes your argument, I don't know if it makes you lose, but it makes your argument a little harder, because one argument that I think the government wants to make, which is to say, this is not merely foreseeable, but it's an integral part or an essential part of the scheme, because SPMC isn't going to make these loans unless it has the ability to sell the loans afterwards. How do you respond to that? Well, whether or not they could sell the loans afterwards has no bearing on whether they funded the loan in the first place. Well, it might or might not. Usually you wouldn't fund a loan where you knew there was no borrower with credit or other resources to back up payment. I mean, that's just bad banking practice, which we learned, of course. But if you offload the loan, then you're in a completely different situation. You might have some liability to Countrywide or Washington Mutual or whomever, but the little group of people who are involved in the loan scheme are basically home free at that point. But it's not a prerequisite. I look at this case more as as... Well, it may not be a prerequisite, but they wouldn't have done it if they didn't have pretty good assurance that they could sell these. But they didn't pre-sell this prior to funding, though. No, but... They packaged these with... But they – but the whole scheme was – that's sort of the argument is you've got the whole scheme here, and this is necessarily foreseeable because that's what makes the whole thing work. I don't necessarily agree that it makes the whole thing work. I think that the funding took place. Once it then goes to Folsom and they package it with hundreds of other loans and then sells them off to Countrywide or whoever else wants to take over the loan, that doesn't negate the fact that they've already funded the loan. If they can't resell it in the open market, they still are stuck with the fact that they funded the loan. And so once that scheme is done, Mr. Coley and the co-conspirators have their money. They have their funds, and I know that's not a requisite, but they have it. And so to me, just the reselling, that's an after – that's not another step in the process is what I'm suggesting. You know, you've got to dance between or among some Supreme Court cases. The one that's maybe against you is Schmuck. A couple that are in your favor are Parr and Mays. I have trouble finding the path between those two. It's Sill and Charybdis for me, and I'm not sure there's any space between this Sill and Charybdis, but the Supreme Court tells me there's a difference, and I've got to figure out which side you go to. Help me out. Let me look at Schmuck first, because here's how I see Schmuck. That's the turning back of the odometer. Yes. Where Schmuck got involved with the mail fraud and where that kicked in and the Supreme Court said, this was a title application form to the state on the behalf of the buyer. That's what was ultimately sent, and that's what the Supreme Court was looking at. That form was a prerequisite for completing the resale. So basically what you're saying is – And that – but just to be clear, the fraud is – the guy who's being prosecuted is the guy who's turning back the odometers and selling the cars to the dealers. The dealers are then trusting him, trusting the odometer as it reads rather than as it actually should have been, selling the cars to customers, and then the dealers are mailing the title documents that go back and forth in order to complete the sale from the dealer to the customer. That's correct. Okay. So one way of looking at Schmuck is that the fraud is completed as soon as the defendant has sold those cars with the bad odometers to the dealer. But the court doesn't say that. The court says something the dealer does later to facilitate its sale to the customer is part of the fraud. That's correct. So how do you get out from under that, that is to say, how is this different from, I borrowed the money. I borrowed the money from SP, whatever it is, service at MC, and in order for them to complete the deal so it makes it profitable to them, they then resell it to Countrywide. So the analogy is maybe not precise but close enough to be troublesome. It might be – well, I see a big difference, but that's why I'm here. Yeah, well, help me out. The difference here is this. If the tags were never – if that final step in Schmuck was never done, the tags would not have been sent out through the Department of Motor Vehicles. Right. Therefore, the car would have never have been legally drivable and on the road, and so the whole scheme would have just blown up because then it would have gone back to Schmuck. Here, in this situation, the fact that if SPM – it would have gone back to Schmuck. I mean, I'm not sure. It would have been – maybe it would have just gone back to the dealer and said, hey, you didn't send in the title documents. I misspoke. Maybe it was just that one step in the process that the U.S. Supreme Court is referring to, that extra one step in the process that's needed to complete the circle because without the tags, you have an illegal vehicle on the road. You need the tags. That needed to be sent in by the second individual, the retailers, on behalf of the buyers. Here, SPMC did not necessarily need to complete that circle by sending in or sending to Folsom the loan to be resold. If they didn't – and that's kind of where I'm having a semantic question that you can help me with. They didn't necessarily need to because there's a lot of things that didn't necessarily have to happen. But was it foreseeable and was it known really that this would be in furtherance of the scheme when the loan documents basically say, look, we're not a servicer and we intend to sell this loan. So everybody's kind of in signing up to those documents knows that that is going to happen. I guess we're then down to what do you think – what does it mean to be in furtherance? Because they certainly knew they were going to sell them and they said that, right? Yes. Okay. They knew there was – Well, they've done it for 100 percent of the time before and it said that in the documents basically that they intend to assign, sell, or transfer apart from the servicing, which they don't do anyway. That's correct. So then the question is whether that's in furtherance. And in your view, given the standard we have here, why would we not uphold the verdict? What is it about the furtherance that's missing? Well, in the con, the par, and the maze, the sort of the test that they came up with is this is not a step in the plot. It's immaterial to the consummation of the scheme. That's what they said, the Supreme Court said, this Court has said over and over and over. Is that – it might be immaterial to your client individually once he gets his money, but the scheme is broader than him. I mean, he's putting these documents in so they can flow through this process. So that's where I'm having the disconnect here. I mean, I think vis-a-vis him, I can understand where he says, I don't care what you do with it once I get my money. Is that the benchmark? No, it's not. And nor has any of the cases, con, par, maze, schmuck, any of these cases said that they needed to know that that one step. But to me, and again, going through all these cases, in schmuck, I understand where the title is needed for a legal car on the street. Whereas in con, this was where they were sending bank checks, were sent back to the drawee bank, and therefore it wasn't material to the scheme. In par, it was where they were getting gasoline, and the oil company sent the invoice back to the school for payment. And again, the Court said, it's not a step. It's immaterial to the consummation of the scheme. Just because I don't see, and I guess the question that's never been raised is, how would this scheme have fallen had SPMC not sent that loan to Countrywide? How would it have failed? And that's the question that I don't think anyone can answer because it had already been, the consummation of the scheme had already been done once they received the money, and I know that's not what. Here's my problem on the other side. I mean, okay, I have trouble distinguishing this case from schmuck, but I've got trouble distinguishing the case, particularly from the two credit card cases, where it's very obvious that the sellers who are giving goods or services in return to the credit card, there's no way they would have done that, absent their expectation that they can use wire to get money from the credit card. And any time I give somebody a credit card, I know darn well that's exactly what's going to happen. Without the ability to use the credit card mechanism as payment, the guy's not going to pay me, which means that sounds identical to this case. Without the ability to resell the loan to Countrywide, SPMC is not going to make the loan. So why is this case different from Parr and Mays? I don't think it is, but I also have trouble seeing how it's different from schmuck. In other words, I'm right where Justice Scalia is, in dissent and schmuck. I find myself in an unaccustomed position. I'm not exactly sure that that's what would have produced a trial, that SPMC would not have made the loan had they not had a buyer on the market, because clearly they funded the loan without a buyer on the market. Let me ask you about that, because we're now looking at sufficiency of the evidence. They know they've been able to sell these. I mean, they wouldn't have done it as a matter of common sense if they couldn't have offloaded it. Now the question I have is, well, is there evidence of that? I don't believe there is any evidence of SPMC coming in and saying, we would not have funded this loan had we not had a buyer, because they didn't have a buyer. Well, not had a buyer, but this was part of our – is there evidence that that was part of the overall scheme, that they went ahead and they were going not only to the loan documents say it, but that that was the practice? Well, we know that was their practice because they put that on all their literature, that they are not a servicer and that that's what they were going to do. So we know that. But I'll go back to they didn't have a buyer because they would package these hundreds of – I understand that. Right. And so – The question then is, what is the jury benchmarking this evidence against? And then we're looking on appellate review of kind of – I understand. All the inferences favorable to that gentleman or his client sitting over there. But I am looking for some evidence. It would help me if there were evidence that somehow, you know, once they funded it, scheme over kind of. That's what your argument is. That's what my argument is. But I don't think the cases necessarily obviously call for that because in Schmuck, scheme was over when he sold the car. So I'm not saying that. I'm going beyond that as well and saying that the servicing or the reselling of it was not a necessary step. The consummation of the deal was done when the loan was funded. That's why I go along these lines. Obviously, that's where I'm at. Do you want to reserve? I'm sorry? You have 30 seconds left. I appreciate that. I didn't even get involved in the forfeiture, so I will reserve. Thank you. Okay. Good morning, Your Honors. May it please the Court. Robert Ellman for the United States. As the Court well recognizes, this case is going to resolve to whether it's closer to the Schmuck facts or whether it's closer to May's and analytically closer. I'd like to first address just a couple of points I heard opposing counsel make. First, he said it was critical that the loan had already been funded. It can't be critical that it was already funded because that is an identical fact that you have in Schmuck. The defendant had been paid there. He also says it has no bearing whether Sierra Pacific Mortgage Company can resell the loan, but we know that it does have bearing because it says specifically, and the references are at pages 10 and 11 of our answering briefs, that the loan will be resold. They are not in the business of servicing these loans. Well, I'll take it. But just on that point, I know, of course, you can continue, but I think it's undisputed that he knows or can be charged with knowledge that this loan is going to be sold, okay, and that that would involve some transaction through the mail. Okay, I got that. I don't know that it was explicitly said in the two credit card cases that the person selling pursuant to the credit card is going to collect it from the credit card, but I don't think it needed to be said. Everybody and his dog knew that. So far, you haven't distinguished me from the two credit card cases. Well, let me try to get to your point by finishing mine first because it may answer you. Okay. And it's this. If SPMC is not in the business of funding loans from a pool of capital that it perpetually funds, keeps them, collects the interest, and makes their money that way, they're not. They've said they're not. The defendant's on notice, as you observed, Your Honor. They can't stay in the business they're in if they don't resell it, and they can't resell it if they don't mail it. Yeah, and how is that different from the merchants who sell pursuant to credit cards? Because you have an ongoing scheme here, Your Honor, and one point unaddressed so far is that the government's witness said that a portion of the proceeds received when these loans were funded and part of it was diverted to the co-schemers were used to pay some of the obligations on the earlier loans. That keeps them in business just as the goodwill of the car dealers in Schmuck kept that defendant in business. This particular scheme involved at least 14 properties over four years in three states. They have to do this repeatedly. That is their scheme. That's how they make the money. If the first one collapses, the second one's never going to come along. All right. So that's how it would have failed. They would never have funded a loan that they could not have resold, and that was necessary to keep the scheme going. And I'm now beating a dead horse. That's exactly the problem in the two credit card cases. If they can't get money based on credit cards, those guys are not going to stay in business either. Well, yeah, and I understand the difficulty with that, except that, you know, in some of these cases you have one transaction. You have in Mays, for example, where he steals the roommate's credit card and checks into the hotel in another state. That's very different from the type of scheme that's being run here. He's stolen a credit card. He wants to use it to pay for things, and he's done. Now, the mailing in Mays is going to trip him up. It's going to end his scheme because when the downstream creditors get the mail, they're going to know that he has defrauded them. It's just the opposite here. The mailing furthers the scheme because it enables the initial seller to resell the loan. Well, it just takes a little longer for his fraud to get caught. Well, I would agree if the mailing in Mays would in any way help them, but as the Court observed there, we don't know, but he probably hoped that they would lose it and never mail it for exactly that reason. So I think they're analytically distinct for that reason. And, Your Honor, I recognize and acknowledge that this is not a set of clean parameters that you can look at a case and quickly say it falls into A or B, but I think it's distinctly closer to Schmock. Does the standard of review here and the evidence you point to distinguish this case from Mays? Does the standard of review distinguish it? Right. Wait a minute. Is there anything? I mean, we fall between two cases, okay? So we're going to have to tip one way or the other. And my question is, what's the tipping point in your view? I know what his is because he's explained it. And so I'm just wondering what's your tipping point? Well, I don't think it depends on the standard of review. And, you know, I think we acceded to that, what the standard was. I think we're in agreement on that. Are we not? I thought that no. I'm not saying you disagree on the standard. I'm just saying that the standard affects how we filter the facts. Filter the judgment. Well, you know, we've stated the Jackson v. Virginia approach to this. I'm trying to have you say. I mean, you're fighting me. I think you're trying to help me, and I don't know how. Is that different or not? Or is that basically the same as in Mays, is in the same posture? I don't remember what the posture in Mays was, Your Honor. I'm sorry. I think I might have won the argument if I had known the answer to that question, but I don't. I'd point out, too, that in the Lowe case, that was real estate fraud as well. That was also very similar to this on the four counts that were affirmed. I would like to move to the asset forfeiture issue, if I may. Let's stay with Schmuck, though, because, I mean, here is a distinction between Schmuck on the one side and the credit card cases on another. You touched on it, and maybe this is the difference that moves us into Schmuck territory, which is to say this is an ongoing scheme between this defendant or this cluster of defendants and the lender, where they engage in repeated transactions with the same lender, which then takes us into sort of the goodwill of the person with whom they are dealing. That's the Schmuck category, instead of the credit card cases, where they're sort of moving from victim to victim. Maybe that's... Well, that might help me, Your Honor, if I could say that all the transactions were with Sierra Pacific Mortgage Company, but they're not. But likewise, in Schmuck, it refers to the dealers. That was not one dealer either. There must be on the record, and I don't know, how many different mortgage companies he's dealing with. I don't know specifically. I know in the three cases that we're talking about here, SPMC was one of them. I think First Franklin was the company in the other two. But he's only challenging two of the counts, and it's those two lenders. So with big money, he is moving from victim to victim. Oh, yeah. That doesn't help much, does it? Right. On the asset forfeiture issue, the government filed a 28-J letter back on October 31st, shortly after the Newman opinion came down. The 28-J letter explains why the forfeiture issue in this case has now conclusively been resolved. Forfeiture is mandatory, but it was an issue here. The only unresolved issue in this case is the Eighth Amendment argument that Mr. Cawley raises in answer. Now, that was not a ground that the court rested on when it declined to enter the forfeiture order below. So I would like to address that. First, you have a case in this circuit called 22 Santa Barbara Drive, which says that when you take the proceeds from criminal activity, it is the quintessential example of guilty property. It merely parts the owner from the fruits of criminal activity, and, therefore, it cannot be disproportionate. It is necessarily proportionate. And, therefore, the Badge of Cajun analysis wouldn't apply, the distinction being that the proceeds in Badge of Cajun were not from unlawful activity. It was merely taking money out of the country that you hadn't reported. If you — if that's not enough to resolve the issue, and you do feel that you have to apply the disproportionality analysis, you know, that was not done by the district court, but there are effectively four factors that the court examines under Badge of Cajun, and three of them strongly favor the government here. You look first to the nature and extent of the crime, and as I alluded to earlier, this scheme involved at least 14 transactions in three different states over four years. So it's quite extensive. The second factor, which heavily favors the government, is examining other penalties that may be imposed. And if you look at the PSR and the statutes it cites, you'll see that the defendant could have been fined as much as $5 million in this case. Usually it's the reverse multiplier. They say if the forfeiture or penalty is two or three times higher than the amount of fines, then you have a problem. But this is just the opposite of that, so it's well within it. And then finally, the extent of harm here on just two of the transactions related to this crime, the loss amount was $949,000, which is, you know, higher than the amount the government sought to forfeit. So there don't appear to be any grounds that would support the Court's decision not to impose the forfeiture judgment. Yeah. I understand that the forfeiture amount is mandatory, but the U.S. Attorney's Office has apparently exercised some discretion and asked for forfeiture with respect to only one loan. Is that what's happened? That – it looks like – excuse me, Your Honor. It looks like that's what happened here. And I just want to advise the Court, you know, at the risk of moving beyond the record, and I don't want to do that, but these forfeiture allegations are made in the charging instrument. And at that point, the universe of information is a little different than it is later. I see. But the government has not sought to amend the charging instrument? No, it has not. With respect to the forfeiture, yeah. And it usually, you know, unless the amount is lower, it doesn't change. We wouldn't normally do that. We would not. Yeah, yeah. And it has never been our practice. So even though, as it turns out, more forfeiture might be available now that we've figured out the scheme, you're not seeking a greater amount. That's exactly right. And that is done elsewhere as well. This Olguin case cited in Newman is an example of that. That was an 853 drug case. There were six $600,000 deals, $3.6 million, but the forfeiture amount was $2 million.  Now, is this forfeiture order entered as joint and several liability with the other conspirators? Well, it wasn't entered. I think the preliminary ‑‑ I don't remember if that language is actually in the preliminary order. But should it be joint and several? Yes. Certainly. Yeah. Okay. Unless the panel has questions, I'll yield the remainder of my time. Okay. Thank you. Thank you. Just briefly, one of the cases that does come down sort of on our side is the Kahn case. And that was an ongoing scheme. That's the case where you've got these businessmen and they were sending out flyers and saying, send us checks and we're going to look into doing some businesses. And this was ongoing. They then put the checks into the banks. And where the mail fraud connection came in was the banks would then send the checks to the drawee's bank, the other bank. And that court said, no, this is not a step in the plot. And that was an ongoing thing as well. If the court's looking at ongoing where, you know, there's multiple houses here, the court came down and said that's immaterial to the consummation of the scheme. I would just note that. And that's why I think that this is different than the Schmuck case. In terms of the forfeiture, I'll just briefly, you have my response on it. It is an Eighth Amendment argument. It's an excessive, it's excessive when you look to see what Mr. Cawley actually made on this. He made $800. It was his time. He didn't get a percentage of any deals. He was a printer, and he charged $35, $40 an hour for his time. And he was given the material, and he was asked to do this, and he did it. Certainly he was found guilty of all this. But realistically, $845 is what he made off of this scheme. That's when Judge Pro decided to impose a forfeiture in the amount of $92,000, yet the government is still asking for $783,000 when somebody made $800. That's excessive, and that's what we're talking about when we talk about excessive clause. It's a forfeiture. It is a punishment, but it needs to bear some relation to the gravity of the offense or what my client actually was involved in this offense. It's grossly disproportionate. He made no percentage, and I would submit on that. And I appreciate your time. I know I have. Thank you very much. Thanks so much. Go ahead. So maybe a remand for that purpose or yes? Just so we're clear on this. Are you looking at this case, or are you looking at the case? Well, no, I'm looking at schedule of payments. Excerpt of record eight. Special instructions regarding payment of criminal monetary penalties. I see that's not forfeiture. That's penalties. Never mind. That's a fine. Very good. Thank you. Thank you both.
judges: Thomas, McKeown, Fletcher